Integra Optics, Inc., Plaintiff,

against
Jonathan Messina and OSI HARDWARE, INC., Defendants.


900610-16

Wilson, Elser, Moskowitz, Edelman & Dicker LLP
Attorneys for Plaintiff
(Peter A. Lauricella and Richard Burger, of counsel)
677 Broadway
Albany, New York 12207
Duane Morris LLP
Attorneys for Defendants
(Eve I. Klein, Anthony J. Costantini and Eric W. Ruden, of counsel)
1540 Broadway
New York, New York 10036


Richard M. Platkin, J.

Plaintiff Integra Optics, Inc. ("Integra") moves for a preliminary injunction to enforce the terms of a non-competition agreement signed by defendant Jonathan Messina, a former sales executive. Messina and his new employer, OSI Hardware, Inc. ("OSI"), oppose the motion and cross-move for a declaration that the agreement is unenforceable.
BACKGROUND
Integra is a New York corporation engaged in the design, manufacture and distribution of fiber optic networks and components. Integra was formed in 2007 with three employees, but it now employs over 60 individuals selling products across the United States and throughout the Western Hemisphere. In addition to its Albany headquarters, Integra has offices in western New York, California, and Brazil.
Integra hired Messina as an account executive on March 5, 2013. Messina's sales responsibilities included managing client accounts and relationships, building new business and developing sales strategies. As an account executive, Messina was a primary point of contact between Integra and its customers.
Messina primarily was based in the Rochester, New York, office of Integra, where he conducted the bulk of his work by email and telephone. According to Integra, Messina's 53 customer accounts brought in more than $6 million in revenues in 2015, with just five accounts responsible for more than 70 percent of these revenues. Messina was well compensated by Integra, earning almost $360,000 in 2015.
As an account executive, Messina had access to certain proprietary and confidential information belonging to Integra, including information regarding the company's product lines, manufacturing costs, pricing policies, discounting policies, and business relationships. In addition, Messina received technical training regarding Integra's fiber optic components.
Beginning in or about September 2014, Integra requested on several occasions that Messina execute a non-competition agreement. Messina initially declined, but ultimately did sign an "Employee Proprietary Information, Inventions, Non-Competition and Non-Solicitation Agreement" ("Agreement") on September 4, 2015.
The Agreement includes a one-year covenant against post-employment competition. During such period, Messina agreed that he "w[ould] not, directly or indirectly, . . . solicit, perform, or provide, or attempt to perform or provide Conflicting Services . . . anywhere in the world, nor . . . assist another person to solicit, perform or provide or attempt to perform or provide Conflicting Services . . . anywhere in the State of New York" (§ 6).[FN1]
The term "Conflicting Services" is "defined as selling product for the following organizations: Pro Labs, Champion, OSI, Precision Oprics [sic], Menera Networks, Solid Optics, or any companies with a significantly similar product and market position". 
Messina also covenanted not to use or disclose Integra's "Proprietary Information", including "information regarding . . . marketing and selling, business plans, . . . prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, . . . [and] customers and potential customers of the Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by the Company" (§§ 1.2, 1.4).
In executing the Agreement, Messina acknowledged that the post-employment restrictions to which he assented were "reasonable, proper, and necessitated by [Integra's] legitimate business [*2]interests" (§ 7.1). Messina further recognized that "it may be impossible to assess the damages caused by [his] violation of th[e] Agreement", "that any threatened or actual violation . . . will constitute immediate and irreparable injury to [Integra]", and that Integra "shall have the right to enforce th[e] Agreement . . . by injunction, specific performance or other equitable relief, without bond" (§ 10.1). Finally, the Agreement obliges Messina to pay Integra's attorney's fees and other costs if it prevails in an action to enforce the Agreement (§ 10.2).
Messina resigned his employment with Integra effective April 1, 2016. On or about April 7, 2016, Integra learned that Messina was considering accepting employment with OSI, an alleged competitor and one that expressly is identified in the Agreement as offering "Conflicting Services". Integra registered its objection with OSI, a California corporation, but defendants advised on April 18, 2016 that Messina had accepted employment with OSI.
Integra commenced this action by Order to Show Cause ("OTSC") dated April 28, 2016, seeking the following preliminary injunctive relief: (1) an order restraining Messina from engaging in any conduct that violates the Agreement and from taking any further action to violate the Agreement; (2) an order enjoining OSI from taking any further action to induce Messina to breach or violate the Agreement, including continuing to employ him; (3) an order enjoining Messina and OSI from using or disclosing any of Integra's confidential or proprietary information possessed by Messina in furtherance of OSI's business; and (4) an award of attorney's fees and costs pursuant to the Agreement. 
Defendants oppose the motion and cross-move for a declaration that the Agreement is unenforceable because, inter alia: (1) the restrictive covenant is overly broad and not necessary to protect Integra's legitimate interests; (2) Messina's assent to the Agreement was the product of economic duress; and (3) Messina was constructively discharged from his employment at Integra.
The motions were made returnable on May 25, 2016. The Court scheduled oral argument for June 14, 2016, but that day instead was devoted to settlement efforts. The parties returned on June 22, 2016 and, following oral argument on the motions, the Court directed an immediate evidentiary hearing regarding the circumstances surrounding Messina's execution of the Agreement, including defendants' claim that Messina's assent to the Agreement had been procured through Integra's threats to withhold earned compensation.
Post-hearing submissions were received from the parties on July 1, 2016. This Decision & Order follows.
ANALYSIS
To obtain a preliminary injunction, the moving party has the burden of demonstrating: (1) a likelihood of ultimate success on the merits; (2) the prospect of irreparable harm in the absence of the requested injunctive relief; and (3) a balance of the equities tipping in favor of the movant (see CPLR 6301; Nobu Next Door, LLC v Fine Arts Hous., Inc., 4 NY3d 839, 840 [2005]; Confidential Brokerage Servs., Inc. v Confidential Planning Corp., 85 AD3d 1268, 1269 [3d Dept 2011]).
The Court begins with the issue of Integra's likelihood of success in enforcing the covenant against post-employment competition ("Non-Compete Clause"). There is no dispute that Messina has breached, or will breach, the express terms of the Non-Compete Clause by selling fiber optic components for OSI, which is identified in the Agreement as a provider of "Conflicting Services". Thus, Integra's likelihood of success turns on the enforceability of the Non-Compete Clause and the Agreement itself, both of which are challenged by defendants.
[*3]A.Enforceability of the Non-Compete Clause Under New York Law
The contracting parties chose to have the Agreement governed by New York law, without regard to its conflict-of-law principles. Under New York law, post-employment covenants against competition "are not favored" and will be enforced only in limited circumstances (Morris v Schroder Capital Mgt. Intl., 7 NY3d 616, 620 [2006]). As a general matter, such a covenant "will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee" (BDO Seidman v Hirshberg, 93 NY2d 382, 389 [1999] [internal quotation omitted]).
The Court concludes that Integra is likely to succeed in establishing that the Non-Compete Clause is reasonable in time and geographic scope. Its one-year term falls well within prevailing notions of reasonableness, and defendants do not argue to the contrary. Further, the absence of a geographic limitation seems reasonable under the facts and circumstances of this case, including: (a) the narrow and well-defined market in which Integra operates; (b) the worldwide scope of the market; (c) the nature of Messina's sales and marketing activities, which are conducted largely by email and telephone; and (d) the relatively brief duration of the covenant. Further, OSI has offices across the United States and appears to conduct its sales activities in a manner similar to Integra.
In claiming that enforcement of the Non-Compete Clause is necessary to protect its legitimate interests, Integra cites the need to prevent the unfair exploitation of its proprietary information, including competitive information regarding its product lines, costs, pricing, marketing strategies and business relationships, and to protect the goodwill of its customers and prospective customers. Defendants dispute these contentions and claim that the covenant is overly broad in several respects.
While recognizing that OSI is one of six companies identified in the Agreement as a provider of "Conflicting Services", defendants take issue with the portion of the definition that encompasses "any [other] companies with a significantly similar product and market position" (§ 6). In particular, Christian Saunders, the president and co-founder of OSI, avers that "hundreds upon hundreds of companies sell optical transceivers in the United States", and the Non-Compete Clause, if enforced, would prevent Messina "from performing any work for companies in the networking equipment sales and service business, just because they also happen to sell optical transceivers" (Aff., ¶ 14).
The Court does not find this argument to be persuasive. A company will not be deemed a provider of "Conflicting Services" merely because it sells optical transceivers; the company also must possess "a significantly similar . . . market position" to those identified by name in the Agreement (§ 6). Defendants have not submitted proof of any other company with a "product and market position" that is "significantly similar", much less proof of the "hundreds upon hundreds of companies" they allege to fall within the definition. Accordingly, defendants have not shown that the covenant "would apply to every company in [the computer networking] business" (Opp. MOL, at 9).
Similarly unavailing is OSI's claim that it is not a direct competitor to Integra. OSI emphasizes that it sells used and refurbished networking equipment, including routers and switches, as well as computer servers and network support services (Saunders Aff., ¶ 4). According to OSI, Integra is not in the business of selling any of the foregoing products or services; rather, Integra's key products are passive switches, which OSI does not sell, and optical transceivers, which OSI does sell but which are said to comprise only a "minor part of its business" (Opp. MOL, at 10).
The proof adduced by defendants does show that OSI engages in certain lines of business in which Integra does not compete, including routers, switches, servers and network support services. On the other hand, OSI admits that it does engage in the sale of optical transceivers, which is a core product for Integra. Further, while defendants characterize OSI's sale of optical transceivers as a "minor part" of its business, the Saunders affidavit discloses that the sale of optical transceivers comprises 38% of OSI's business (¶ 7). And, of course, Messina expressly acknowledged and agreed that OSI was a provider of "Conflicting Services" in executing the Agreement. In fact, it was Messina who proposed the inclusion of OSI in the definition of "Conflicting Services". In light of the foregoing, Integra is likely to succeed in demonstrating that OSI is a direct competitor with respect to the sale of optical transceivers.
Defendants also challenge Integra's claim that enforcement of the Non-Compete Clause is necessary to prevent the unfair exploitation of Integra's confidential and proprietary information. According to defendants, there is nothing confidential about the identity of Integra's clients, as "nearly every business worldwide is a potential customer for both OSI and Integra" (Opp. MOL, at 11). 
Even assuming that market for optical transceivers is as vast and diffuse as defendants claim, Integra is likely to succeed in demonstrating a legitimate interest in protecting other proprietary, sales-related information from exploitation by a direct competitor for a limited period of time (BDO Seidman, 93 NY2d at 389-391). Integra alleges, without serious contradiction, that Messina enjoyed broad access to its proprietary and confidential information concerning its manufacturing costs, product pricing, discounting policies, sales incentives, and strategic customer relationships. In fact, Messina acknowledged as much in assenting to the Agreement (see §§ 1.2, 1.4). Armed with this information, a direct competitor such as OSI would be in a position to compete unfairly against Integra for sales. This interest appears to be implicated even in the absence of a physical or electronic taking, since Messina, a key member of Integra's marketing team for more than three years, likely would recall and use the proprietary sales and customer-related information with which he had been entrusted during his employment.
The Court further concludes that defendants are unlikely to prevail on their argument that the Non-Compete Clause is overly broad because it prevents Messina from performing work for OSI in areas where Integra does not compete. Messina admits that, unless restrained, he intends to sell the full range of OSI hardware products, including optical transceivers (Messina Aff., ¶ 9). Further, defendants' argument that it may be possible for Messina to service OSI customers without engaging in the sale of optical transceivers — an essential component of all fiber optic networks and one that comprises 38% of OSI's business — lacks record support. Moreover, the mere suggestion of defendants' counsel that OSI, a full-service vendor of networking hardware and services, can restructure Messina's job responsibilities in some unspecified way to prevent him from participating either directly or indirectly in the sale of optical transceivers is insufficient to shift to Integra the burden of demonstrating an entitlement to partial enforcement of the Non-Compete Clause.
Finally, Integra is likely to succeed in demonstrating that enforcement of the Non-Compete is not harmful to the general public and not unreasonably burdensome to Messina. Defendants do not claim that there would be any detrimental impact on the general public if the Non-Compete Clause were enforced and Messina restrained from working for OSI for a limited period. Further, [*4]given its limited duration and the wide variety of other sales and marketing open to Messina within the computer networking field, the Non-Compete Clause places only a relatively modest burden upon him.
Based on the foregoing, the Court finds that Integra is likely to succeed in demonstrating that the Non-Compete Clause is valid and enforceable under New York law.[FN2]

B.Applicability of California Law
Defendants argue that, regardless of the enforceability of the Non-Compete Clause under New York law, the covenant should be deemed void under the laws of California. Defendants allege that OSI is a California-based company with almost all of its employees located in California, and Messina was hired with the understanding that he would relocate to California and work out of OSI's headquarters (Sanders Aff., ¶3). On these facts, defendants contend that California law should apply, including its strict prohibition against restrictive covenants (see Cal Bus & Prof Code §16600).
The starting point of the analysis must be "the basic premises that courts will generally enforce choice-of-law clauses and that contracts should be interpreted so as to effectuate the parties' intent" (Ministers & Missionaries Benefit Bd. v Snow, 26 NY3d 466, 470 [2015]). Here, the contracting parties have expressed their clear intention that the Agreement shall be governed by New York law, without regard to its conflict-of-law principles (§ 13.1). Further, while "courts will not enforce agreements . . . where the chosen law violates some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal" (Brown & Brown, Inc. v Johnson, 25 NY3d 364, 368 [2015]), defendants cannot credibly claim that the application of New York law by a New York court would violate New York's public policy.
And even if this case were to require application of New York's choice-of-law principles, Integra is likely to succeed in obtaining the benefit of New York law. Our State "has long recognized the use of center of gravity or grouping of contacts as the appropriate analytical approach to choice of law questions in contract cases. The purpose of grouping contacts is to establish which State has the most significant relationship to the transaction and the parties'" (Matter of Liquidation of Midland Ins. Co., 16 NY3d 536, 543 [2011], quoting Zurich Ins. Co. v Shearson Lehman Hutton, 84 NY2d 309, 317 [1994] [internal quotation omitted]). 
Integra is headquartered in New York; Messina was and remains a New York domiciliary;[FN3]
the Agreement was executed in New York; and the anti-competitive harm alleged by Integra would be felt primarily in New York. Under these circumstances and notwithstanding Messina's stated intent to relocate to California, Integra is likely to succeed in establishing that New York has the most significant relationship to this controversy.
C.Constructive Discharge
Messina contends that he was constructively discharged from employment with Integra and, [*5]therefore, the Non-Compete Clause cannot be enforced against him. Integra concedes that an otherwise valid covenant against competition may be vitiated where the employee's departure was not voluntary, but argues that Messina's claim of a constructive discharge is contradicted by the evidence, including Messina's own actions and statements.
"Constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation'" (Morris v Schroder Capital Mgmt. Intl., 7 NY3d 616, 621-622, quoting Pena v Brattleboro Retreat, 702 F2 322, 325 [2d Cir 1983]). "Under the constructive discharge test, the actions of the employer in creating the intolerable workplace condition must be deliberate and intentional, and the atmosphere in the workplace must be so intolerable as to compel a reasonable person to leave" (id. [internal citations omitted]). Where the claim of constructive discharge is founded upon loss of pay, courts look to the compensation paid to comparable employees, the percentage of the reduction, and the reasonable expectations of the parties (Scott v Harris Interactive, Inc., 512 Fed Appx 25, 28 [2d Cir 2013]).
Defendants are unlikely to succeed in demonstrating that Integra's adoption of a new commission and bonus plan ("Plan") in early 2016 was a deliberate and intentional effort to create an intolerable workplace environment for Messina. The record shows that the Plan was developed by Daniel Maynard, who joined Integra as Vice President of Sales in June 2015, to encourage the entire Intregra sales force to maximize revenues and expand the corporation's customer base. While Messina believed that adoption of the Plan would be detrimental to him personally, he has not shown that the Plan was anything other than a good-faith and legitimate exercise of Integra's prerogative to realign the compensation of its highly-paid sales executives to further the company's sales and marketing objectives.
Further, Messina's claim that he would experience a 60% reduction in commissions under the new Plan is unconvincing. While Messina submits proof that his commissions in January and February 2016 were lower than 2015 levels, he has not shown that this reduction is attributable to the new Plan. Rather, it appears that other factors, including Messina's own diminished efforts during a stressful period in which he was embroiled in a dispute with his direct supervisor and actively resisting implementation of the new Plan, may have played a substantial role.
Finally, Messina has not shown that the removal of certain of his customer accounts on or about January 1, 2016 gives rise to a viable claim of constructive discharge, either individually or in combination with the implementation of the new Plan. Even assuming that this loss of accounts was something other than a realignment of sales territory or a tactical decision to allow Messina to devote his full attention to his largest and most important customers accounts, a point on which the record is not well developed, the magnitude of the reduction is not so significant as to rise to the level of a constructive discharge. Moreover, Messina's affidavits do not address Integra's contention that the reduction in accounts would have allowed him to earn more commissions from a lesser number of higher value accounts.
Based on the foregoing, Messina is unlikely to succeed in demonstrating that he was constructively discharged from Integra.
D.Duress
Defendants claim that the Agreement was the product of economic duress. According to [*6]Messina, Integra wrongfully procured his assent to the Agreement by threatening to withhold $100,000 in earned commissions that he was owed. 
1.The Parties' Affidavits
Messina claims that he was first asked to sign the Agreement on September 23, 2014 by Lou Traiforos, Integra's Vice President of Sales at the time. Messina declined, allegedly due to discomfort with the breadth of the proposed restrictions. On or about March 1, 2015, Messina refused Traiforos's second request to sign. Maynard joined Integra in June 2015 and almost immediately began pressuring Messina to sign the Agreement.
According to Messina, Maynard stated on or about August 11, 2015 that he would not receive earned commissions and bonuses unless he signed the Agreement. At that point, Messina claims to have contacted Jeff DeWeese, the chief operating officer of Integra, to express concerns.
Messina had a number of conversations with DeWeese and ultimately met with DeWeese and David Prescott, Integra's chief executive, on September 4, 2015 to discuss the agreement. At the meeting, DeWeese allegedly told Messina: " Jon this is just a formality. An agreement like this would never be upheld in the courts, especially in New York. We are just trying to get all our ducks in a row as an organization now that we want to grow. We promise we will take care of you, you have nothing to worry about" (Messina Aff., ¶ 20). "Based on DeWeese's representation and because of [his] fear [he] would . . . not be paid [his earned compensation], [Messina] signed the Agreement" (id.).
In an responding affidavit, Maynard avers that he was apprised by Integra's "Executive Team" shortly after joining the company that certain employees had not signed non-competition agreements, including Messina (Maynard Aff., ¶¶ 19-20). Based upon concerns about the protecting Integra's customer relationships and its proprietary information, DeWeese directed Maynard to follow-up with these executives, including Messina. 
Maynard claims that when he asked Messina whether he would sign the Agreement, Messina stated that he had retained and consulted with counsel and was uncertain whether he wanted to sign. Maynard flatly denies making any threat to withhold Messina's earned commissions and claims, without contradiction, that Messina was paid all 2015 commissions in a timely fashion. Maynard does, however, acknowledge advising Messina that his continued employment with Integra was contingent upon execution of the Agreement.
For his part, DeWeese recalls one meeting with Messina prior to execution of the Agreement, but he is uncertain as to the date. With respect to the September 4, 2015 meeting, DeWeese denies stating that the Agreement was just a formality or that it would not be upheld in the courts. Rather, DeWeese recalls Messina mentioning that he and his attorney had questions regarding the enforceability of the Agreement, to which DeWeese responded that the decision to enforce a non-compete clause is one that rests in the former employer's discretion. DeWeese categorically denies making any statement that the Agreement was unenforceable. DeWeese's account of the meeting is echoed in the affidavit submitted by Prescott.
In a reply affidavit, Messina insists that Maynard did threaten to withhold commissions if he failed to sign the Agreement and claims that Maynard's affidavit testimony to the contrary is untruthful. Messina also denies DeWeese's account of the September 4, 2015 meeting and stands by his averment that DeWeese told him that the Agreement "would never be upheld in the courts of New York" (Messina Aff. in Reply, ¶ 4).
2.The Evidentiary Hearing
Given the sharp and seemingly irreconcilable conflicts between the affidavits submitted by the parties, the Court ordered an immediate evidentiary hearing regarding the circumstances surrounding execution of the Agreement, including Maynard's alleged threat to withhold earned compensation from Messina. The Court directed that each of individuals who submitted affidavit testimony regarding these issues shall testify, with their affidavits serving as direct testimony. Thus, the Court heard live testimony from Messina, Maynard, DeWeese and Prescott. In addition, the Court found good cause to allow defendants to call three former Integra sales executives as witnesses: Melanie Calvanese; Stephen McGann; and David Duncan.[FN4]

On examination, Messina adhered to his claim that Maynard had threatened to withhold earned commissions on two occasions: once in late July 2015 and again in early August 2015. Messina acknowledged negotiating certain aspects of the Agreement, including the definition of "Conflicting Services" and the term of the non-solicitation clause, but he claimed that his decisions to enter into negotiations and, ultimately, to sign the Agreement were the direct result of Maynard's threats. Messina also acknowledged having consulted with a Washington DC attorney prior to signing the Agreement, but he denied having formally retained counsel.
McGann, a former Integra employee and former roommate of Messina, testified that he was present at a July 2015 sales summit led by Maynard. McGann claims that Maynard told the company's entire sales team that Integra could withhold the commissions and bonuses of employees who refused to sign employment agreements. The Court also received into evidence text messages from July 28, 2015, in which Messina complained to McGann that Maynard had threatened to withhold commissions if he did not sign the Agreement (Ex. B).[FN5]
McGann did acknowledge that his Integra employment had been terminated by Maynard and that Messina was his friend.
Calvanese, another former Integra sales executive, testified that threats and pressure to sign a non-competition agreement was one of her reasons for leaving Integra. Calvanese delivered testimony similar to McGann's regarding the July 2015 sales summit, but characterized Maynard's threat as "vague" and "indirect". She also provided a foundation for the introduction of additional text messages memorializing Messina's contemporaneous complaints regarding Maynard's alleged threats in late July 2015.
Defendants' final witness, David Duncan, testified that he resigned from Integra because Maynard had threatened to withhold his earned commissions if he did not sign a non-competition agreement. Duncan also testified that Maynard had told Integra sales executives on several occasions, including at the July 2015 sales summit, that he had withheld commissions from subordinates during his prior employment at Time Warner Telecom and that it was within his power to do the same at Integra.
Maynard testified that he never threatened to withhold Messina's commissions or stated that it was within his power to do so. Maynard further denied telling a story about withholding commissions at Time Warner Telecom or making any statement at the sales summit regarding the withholding of commissions. He acknowledged that the subject of non-competition agreements was raised at the summit, but claimed that it merely was a brief discussion in which he emphasized the importance of employment agreements and explained that they were a condition of continued employment. With respect to his individual communications with Messina, Maynard generally claimed that he sought to educate Messina as to why signing the Agreement would be in his best interests and in the best interests of Integra, but could not recall many of the particulars of his meetings and discussions with Messina.
DeWeese denied stating to Messina or Calvanese that the Agreement was unenforceable or "just a formality". DeWeese claims that he merely explained that the decision to enforce such an agreement rested in the discretion of the employer, and "things would have to be pretty bad" for enforcement to occur. DeWeese admitted to having many discussions with Messina regarding the Agreement, but he, too, professed a lack of recollection as to the particulars, other than to offer his impression that Messina seemed to be stalling.
3.Analysis
A contract may be voided on the ground of economic duress where a contracting party establishes that he or she was compelled to assent to an agreement because of a wrongful threat by the other party that precluded the exercise of free will (805 Third Ave. Co. v M.W. Assoc., 58 NY2d 447, 451 [1983]). "[P]roof that one party to a contract has threatened to breach the agreement by withholding performance unless the other party agrees to some further demand" may give rise to a claim of economic duress (id.; cf. Austin Instrument, Inc. v Loral Corp., 29 NY2d 124, 130 [1971] [threat to withhold needed goods that could not be obtained elsewhere]). "Conversely, a party cannot be guilty of economic duress for refusing to do that which he or she is not legally required to do" (Bechard v Monty's Bay Recreation, Inc., 35 AD3d 1131, 1132 [3d Dept 2006]).
Defendants' claim of economic duress is founded upon Integra's alleged threat to withhold nearly $100,000 in earned compensation from Messina unless he signed the Agreement. In this connection, defendants cite Labor Law § 191 (1) (c), which generally requires sales commissions to be paid monthly or in accordance with the terms of a written agreement governing the issue.[FN6]
Messina further cites his longstanding refusal to sign the Agreement, his abrupt change in position following Maynard's threats, and the substantial amount of compensation that could have been withheld from him.
In response, Integra maintains that the statements allegedly made by Maynard fall short of constituting an actionable threat. Further, Integra argues that the advice Messina received from counsel, Messina's successful negotiations to narrow the scope of the restrictive covenants, and the lapse in time between the alleged threats and Messina's assent to the Agreement all militate against a finding of economic duress. Integra also contends that Messina could have resigned his employment if he truly were unwilling to sign the Agreement, but he signed in order to continue receiving the generous level of compensation then provided by Integra. Finally, Integra argues that [*7]Messina's failure to timely repudiate the Agreement amounts to a ratification.
Based upon the credible testimony and evidence adduced at the hearing, the Court finds that defendants are likely to succeed in establishing that Maynard did threaten on several occasions to withhold Messina's earned commissions. For the most part, Messina's testimony appeared to be credible. Further, Messina's July 2015 text messages to McGann and Calvanese complaining about Maynard's threats to withhold commissions provide a powerful rebuttal to Integra's argument that Messina fabricated his claim of threats in response to this enforcement action.
In contrast, the nervous and evasive manner in which Maynard testified did not appear credible. Additionally, Maynard's oral testimony was not only inconsistent with the testimony given by Messina and the three non-party witnesses,[FN7]
but also with his own affidavit submitted in support of Integra's motion. When confronted with these inconsistencies, it appeared that either Maynard had not carefully read the affidavit prepared for him by Integra's counsel or was seeking to alter his prior testimony.[FN8]
Further, Maynard's attempt to reconcile these discrepancies was unconvincing. In sum, Maynard did not appear to be a credible and forthcoming witness.
The Court further finds that defendants are likely to succeed in demonstrating that Maynard intended his statements to Messina regarding the withholding of commissions to be threats and that his statements were so understood by Messina. A reasonable employee in Messina's position certainly could have taken as a threat Maynard's story of withholding earned compensation from a former sales employee at Time Warner Telecom until she could no longer survive on her base pay and ultimately assented to a non-competition agreement (see T 138:3-11). In any event, Messina also testified that, on or about August 11, 2015, Maynard not only repeated the Time Warner Telecom story, but also directly threatened to withhold his earned compensation (T 144:12 - 145:4). Given the clear import of Maynard's story as well as Messina's proof of direct threats, this does not appear to be a case where the party claiming duress is relying upon mere self-imposed or subjective fears (cf. Boyer v Whitestone Lbr. Corp., 23 Misc 3d 1114 [A] [Sup Ct, Nassau County 2009]).
The issue of whether Maynard's threats precluded Messina from exercising free will presents a more substantial issue, however. Messina appeared sincere in testifying that he had "no choice" but to sign the Agreement because he could not afford to have almost $100,000 in earned commissions withheld (T 156:17-21). Moreover, Messina's long-standing refusal to sign the Agreement and the brief interval between Maynard's threats and Messina's newfound willingness to enter into negotiations regarding the terms of the restrictive covenants lend some support to defendants' claim of economic duress.
On the other hand, Integra identifies a number of factors that militate against a finding that the Agreement was the product of wrongful threats. Messina acknowledged that he received advice [*8]regarding the Agreement over a four-month period from an attorney, trusted advisors and mentors, and from his colleagues at Integra. Messina also played an active role in negotiating the terms of the Agreement, and he did succeed in limiting the breadth of the Non-Compete Clause and the duration of the non-solicitation clause. Moreover, the record shows that Integra paid Messina $34,302.89 in commissions on July 24, 2015 and another $47,323.29 on August 21, 2015 — the critical period in which Maynard's threats to withhold compensation alleged precluded Messina from exercising his free will with respect to execution of the Agreement (see Plaintiff's Ex. 4).
Integra also has adduced substantial and credible evidence that Messina signed the Agreement because he wished to remain a highly compensated employee of Integra and not due to the alleged threats. For example, in explaining to McGann and Calvenese why he remained at Integra despite his reservations about the Agreement and concern over Maynard's threats, Messina stated that "the money is too good right now" (Ex. B) and that he would leave Integra if he "wasn't making the money" that Integra was paying him (Ex. A). Moreover, Messina was advised that execution of the Agreement was a condition of continued employment, and he certainly could have chosen to leave Integra rather than bind himself to the Agreement.[FN9]
Thus, the trier of fact ultimately may find that Messina exercised his free will to assent to an Agreement that he believed to be overly broad and potentially detrimental to his future simply because "the money [was] too good" (Ex. B), and not due to alleged duress.
Considering all of these factors, the Court concludes that the present record, compiled without the benefit of any discovery,[FN10]
is insufficiently developed to reach a firm conclusion on defendants' claim that the Agreement is the product of Maynard's alleged threats. Nonetheless, defendants have adduced substantial evidence in support of this defense and thereby called into serious question Integra's ultimate likelihood of success on the merits. "While mere issues of fact will not preclude a preliminary injunction, sharp factual disputes obscuring the likelihood of success will bar the remedy" (Eklund v Pinkey, 31 AD3d 908, 910 [3d Dept 2006]). For this reason, the Court finds that Integra has not met its burden of demonstrating a clear right to the requested injunctive relief.
The Court emphasizes that the limited issue before it at this juncture is plaintiff's application for a preliminary injunction,[FN11]
not whether the Agreement ultimately is enforceable at law through an award of monetary damages. As an equitable remedy, a preliminary injunction should be granted only where the balance of the equities tips in favor of the movant (Ulster Home Care v Vacco, 255 AD2d 73, 76 [3d Dept 1999]). Moreover, "[w]here a litigant has [it]self been guilty of inequitable [*9]conduct with reference to the subject matter of the transaction in suit, a court of equity will refuse [it] affirmative aid" (Levy v Braverman, 24 AD2d 430 [1st Dept 1965]; see Tepfer v Berger, 119 AD2d 668 [2d Dept 1986] ["moral considerations of fundamental importance require that the litigant come into court with clean hands'"]).
Regardless of whether defendants ultimately can meet their heavy burden of voiding the Agreement as the product of economic duress, the Court finds that Integra's apparent use of wrongful threats in connection with efforts to procure Messina's assent to the Agreement tips the balance of equities away from an award of preliminary injunctive relief and bars such provisional relief under the doctrine of unclean hands.[FN12]

Thus, on the facts and circumstances disclosed by the present record, it would not be a provident exercise of the Court's equitable powers to enter a preliminary injunction that would "sanction[] the loss of a man's livelihood'" (Reed, Roberts Assoc. v Strauman, 40 NY2d 303, 307 [1976], quoting Purchasing Assoc. v Weitz, 13 NY2d 267, 272 [1963]).
CONCLUSION
Accordingly, it is
ORDERED that Integra's motion for a preliminary injunction is denied; and it is further
ORDERED that defendants' cross motion for a declaratory judgment is denied; and finally it is
ORDERED that the parties shall confer regarding a schedule for disclosure and the filing of a note of issue and, within twenty (20) days of the date of this Decision and Order, either: (i) stipulate to a scheduling order, which shall be submitted to the Court for approval; or (ii) request a scheduling conference with the Court.
This constitutes the Decision and Order of the Court. The original Decision and Order is being transmitted to defendants' counsel for filing and service, and a courtesy copy is being uploaded to NYSCEF. The signing or uploading of this Decision and Order shall not constitute entry or filing under CPLR Rule 2220, and counsel is not relieved from the applicable provisions of that Rule respecting filing, entry and Notice of Entry.
Dated: Albany, New York
July 15, 2016
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Nos. 1-5, 7-14, 17-18, 23-27, 29, 34-49, 55, 57-58, 62-63;
Hearing Transcript (June 22, 2016 and June 24, 2016);
Hearing Exhibits (Plaintiff's Exs. 1-4; Defendants' Exs. A-B).



Footnotes

Footnote 1:The Agreement also contains a one-year covenant against: (a) soliciting Integra's employees (§ 5.1); engaging in business with individuals who recently terminated their employment with Integra (§ 5.2); and soliciting Integra customers and potential customers with whom Messina worked directly or indirectly (§§ 5.3, 5.4).

Footnote 2:Since the Non-Compete Clause precludes Messina from soliciting on behalf of OSI, there is no need for the Court to separately assess Integra's likelihood of success in obtaining enforcement of the non-solicitation clause of the Agreement.

Footnote 3:In opposition to the motion, Messina merely states his intention to relocate to California (¶ 47). Indeed, even as of the June 22, 2016 hearing, Messina remained a New York resident.

Footnote 4:These individuals also submitted affidavits as their direct testimony.

Footnote 5:As stated on the record, the Court received this evidence of a prior consistent statement on the part of Messina to rebut Integra's claim of recent fabrication. Specifically, in opposing the cross motion and in further support of its own motion, Integra relied upon evidence and argument that Messina did not make contemporaneous complaints of any threats to Integra's human resources department or to Maynard's superiors.

Footnote 6:The parties have not submitted proof of any written agreement in effect at pertinent times governing Integra's payments of commissions to Messina.

Footnote 7:While the Court recognizes that there were certain inconsistencies in the accounts given by the non-party witnesses and finds certain aspects of their testimony to be exaggerated and overly self-serving, their claim that Maynard told the story about withholding commissions from a former employee at Time Warner Telecom rang true.

Footnote 8:Examples of this include Maynard's oral testimony denying that it was a priority to get Messina, a key sales executive, to sign the Agreement and Maynard's claim that he was unaware of Integra's prior efforts to get Messina to sign the Agreement.

Footnote 9:Duncan testified that he was presented with similar threats from Maynard, but simply decided to leave Integra and pursue employment elsewhere, without the loss or withholding of earned commissions.

Footnote 10:Indeed, even in the brief interval between submission of Integra's motion and the evidentiary hearing, both sides have adduced highly relevant emails and texts bearing on the claim of duress.

Footnote 11:Defendants' cross motion for declaratory relief, which amounts to a premature motion for summary judgment on a then-unpleaded claim for declaratory relief, is denied as procedurally defective.

Footnote 12:For similar reasons, the Court would decline to partially enforce the restrictive covenants through preliminary injunctive relief if they were determined to be overbroad. On the present record, Integra is unable to demonstrate the "absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct" (BDO Seidman, 93 NY2d at 394-395).